IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Petitioner,*

*v.*

HOPE LYNETTE KING, *Respondent.*

No. 1 CA-CR 17-0543 PRPC
FILED 02-04-2021

Petition for Review from the Superior Court in Maricopa County
No.  CR2001-003384
The Honorable Michael D. Gordon, Judge

**REVIEW GRANTED;**
**RELIEF GRANTED; REVERSED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Lacey Stover Gard, Andrew S. Reilly
*Counsel for Petitioner*

Osborn Maledon PA, Phoenix
By Larry A. Hammond, Joseph N. Roth
*Co-Counsel for Respondent*

Arizona Justice Project, Phoenix
By Katherine Puzauskas
*Co-Counsel for Respondent*

Lewis Roca Rothgerber Christie LLP, Phoenix
By Robert H. McKirgan, Daniel A. Arellano
*Counsel for Amicus Curiae International Association for Women's Mental Health;
National Advocates for Pregnant Women; National Association of Social Workers;
National Women's Health Network; Postpartum Support International; Tucson
Postpartum Depression Coalition; Margaret Spinelli; Michelle Oberman; Teresa
Twomey*

---

**OPINION**

Judge David D. Weinzweig delivered the Opinion of the Court, in which Judge Maria Elena Cruz joined. Presiding Judge Michael J. Brown dissented.

---

**W E I N Z W E I G**, Judge:

¶1　　　　A jury convicted Petitioner Hope King of eight counts of felony child abuse in 2002, and she was sentenced to the mandatory minimum of four consecutive ten-year prison terms. Ten years later, King petitioned the superior court (the "PCR court") for post-conviction relief under Arizona Rule of Criminal Procedure 32.1(e), seeking a new trial based on "newly discovered scientific evidence" that enabled a clinical psychologist in 2010 to conclude that King suffered from postpartum psychosis in 2001 when she caused serious physical injury to her infant daughter. After an evidentiary hearing, the PCR court granted post-conviction relief, ordering that King receive a new criminal trial because the scope of diagnostic criteria for postpartum psychosis had expanded since her 2002 trial.

¶2　　　　The State of Arizona petitions for review. We grant review and relief, reversing the PCR court's order because King could have been diagnosed with postpartum psychosis before her criminal trial, even if the likelihood of diagnosis later improved when medical science expanded the menu of diagnostic criteria.

**BACKGROUND**

¶3　　　　Paramedics responded to an emergency call from King's apartment in February 2001 to find an unresponsive, "limp" infant in respiratory distress. The infant was King's daughter, then nine months old. She had dried blood stains around her nose and mouth; her chest cavity was slightly deformed. The infant was rushed to the hospital, where tests revealed a broken jaw, blood on the brain and in her eyes, two skull fractures and 15 broken ribs. King admitted to police that she inflicted the injuries. The State charged King with attempted murder and eight counts of felony child abuse.

¶4        A public defender, Bruce Peterson, was appointed to lead King's defense. Peterson generally understood that postpartum mothers could develop mental health issues and harm their children, and he believed King had mental health issues based on her frequent crying episodes in his presence. Peterson thus hired Dr. Richard Rosengard, a psychologist, to evaluate King's mental health. Dr. Rosengard personally examined King and interviewed her. Although her account of events has now changed, the medical records show that in 2001 King denied having "auditory or visual hallucinations" or suicidal thoughts. She "admitted to biting her daughter on the arm," but "could not tell [Dr. Rosengard] why." Based on his examination and King's answers, Dr. Rosengard authored a written report, diagnosing King with several mental disorders, including "major affective disorder, depression" and "posttraumatic stress disorder." Dr. Rosengard's report never examined whether King suffered from postpartum mental illness; indeed, the word "postpartum" never appears in his report.

¶5        What happened next is unclear. Although not mentioned in the PCR petition, Peterson would later testify he retained a second unnamed pretrial "postpartum expert," who agreed that King had no postpartum insanity defense. The record is largely silent about this second expert. There is no written report, no contemporaneous description of a report, no opinions or conclusions, no correspondence and no indication of how or why this second expert reached the opinion.

A.        **Trial, Direct Appeal and First Petition for Post-Conviction Relief**

¶6        At the 2002 trial, Peterson argued that King did not intentionally or knowingly harm her infant daughter and instead "snapped," pointing to "a history of mental disorders in her family and her inability on th[at] particular day to control [a] switch." The prosecution called 13 witnesses. King called none, and she presented no other evidence. The jury convicted King of eight counts of child abuse but hung on attempted murder.

¶7        At sentencing, King offered evidence and argument to show she suffered from postpartum mental illness when she committed the offenses, including letters from family members who described her misconduct as an "aberration[]." King herself emphasized that she suffered from a "debilitating disorder" known as postpartum depression and "was never prepared for [its] severity." She wrote the judge only weeks after her criminal trial, stressing that she "was extremely mentally not stable due to

a serious disorder that is truly now being shined upon with a whole new light." She recounted the disorder's "awful" symptoms, including her "difficulty controlling emotions," "cr[ying] for no apparent reason," sleeping too much or not at all, and never wanting to leave the house. The court sentenced King to the minimum mandatory, mitigated sentence of four consecutive ten-year terms. The trial judge remarked that "even if the mental health experts didn't tell us, it's obvious that to do what [King] did must involve serious mental health issues."

¶8 On direct appeal to this court, King raised two evidentiary issues but did not mention her mental condition. We affirmed the convictions and sentences. *State v. King* (*King I*), 1 CA-CR 02-0889, ¶ 21 (Ariz. App. Oct. 9, 2003) (mem. decision).

¶9 King sought post-conviction relief from the superior court in 2004, arguing her mandatory sentence was "grossly disproportional" and thus unconstitutional. She emphasized her "mental health," but only as a circumstance "support[ing] a finding that [her] 40-year prison term is grossly disproportionate to her crimes." The superior court summarily dismissed King's petition. We denied review. *State v. King* (*King II*), 1 CA-CR 05-0439-PRPC (order filed Jan. 6, 2006).

## B. 2010 Diagnosis

¶10 Around five years later, a nonprofit group retained Dr. Christina Hibbert, a clinical psychologist, to examine King and "provide [an] expert opinion" on whether King suffered from "postpartum mental illness" when she abused the child.

¶11 Dr. Hibbert reviewed King's medical records and twice examined King in person before releasing her written conclusions in December 2010. Dr. Hibbert determined that King suffered from postpartum psychosis in 2001 and pointedly criticized Dr. Rosengard's pretrial evaluation:

> Considering the time frame of the abuse (within the first year postpartum), it seems obvious to this examiner that postpartum mental illness must be ruled out. This report does not mention the term 'postpartum,' however, and clearly Ms. King was not evaluated for postpartum mental illness in this evaluation.

¶12 Dr. Hibbert expressed dismay that King never received "a thorough mental health examination" for postpartum issues, especially

4

given the "serious," "obvious" and "clear" mental health issues. Dr. Hibbert also reported a greater "general awareness and understanding" of postpartum disorders among the medical community since 2002. Even so, Dr. Hibbert lamented the failure of "legal, medical and mental health professionals helping Ms. King at the time of her trial [who] did not comprehend perinatal mental illness."

### C.      2012 Petition for Post-Conviction Relief

¶13      In April 2012, King filed a successive petition for post-conviction relief under Rule 32.1(e), requesting a new criminal trial based on Dr. Hibbert's 2010 diagnosis of postpartum psychosis, described as "a disease that many in the medical community were not fully aware of" in 2002 because it had "not yet [been] fully researched or understood." She floated a related, even if inconsistent, claim of ineffective assistance of counsel, arguing her trial counsel "failed to discover and raise postpartum psychosis to negate the specific intent of King's convictions or as an affirmative insanity defense."

¶14      The State opposed King's petition, countering that her 2010 diagnosis did not present "newly discovered material evidence" under Arizona Rule of Criminal Procedure 32.1(e). The State framed its position against a historical backdrop, arguing that "information about postpartum depression and postpartum psychosis was available" and "could have been discovered [before King's original trial] through reasonable diligence." It offered a dozen published decisions "from [courts] across the country [that] discuss[ed] postpartum psychosis" in the 49-year period leading to King's trial.[1] The State also pointed to a dozen law reviews and legal periodicals that explored the merits of King's precise defense from coast (California) to

---

[1]      *See Murray v. St. Mary's Hosp.*, 113 N.Y.S.2d 104, 105 (1952); *Pfeifer v. Pfeifer*, 280 P.2d 54, 55 (Cal. Dist. App. 1955); *Schuler v. Berger*, 275 F. Supp. 120, 122 (E.D. Pa. 1967); *Burch v. Burch*, 398 So.2d 84, 86 (La. App. 1981); *Commonwealth v. Comitz*, 530 A.2d 473, 475 (Pa. Super. 1987); *Edwards v. Arlington Cty*, 361 S.E.2d 644, 647 n. 5 (Va. App. 1987); *People v. Massip*, 271 Cal. Rptr. 868, 873 (App. 1990); *In re Cory M.*, 2 Cal. App. 4th 935, 941 (1992); *Bahrenfus v. Psychiatric Sec. Rev. Bd*, 853 P.2d 290, 292 n. 3 (Or. App. 1993); *In re Elizabeth R.*, 35 Cal. App. 4th 1774, 1778 (1995); *In re Adoption No. 12612*, 725 A.2d 1037, 1040 (Md. 1999); *People v. Sims*, 750 N.E.2d 320, 325 (Ill. App. 2001).

coast (New York) before King's trial.[2]   And, lastly, it emphasized that postpartum psychosis was covered in the popular press before King's trial, citing ten examples between 1987 and 1997.[3]

¶15      Most important here, the cable network MSNBC reported on the scourge of postpartum psychosis in April 2001.  That story, *A Mother's*

---

[2]      *See* Marcia Baran, *Postpartum Psychosis: A Psychiatric Illness, a Legal Defense to Murder, or Both?,* 10 Hamline J. Pub. & Pol'y 121 (1989); Lori A. Button, *Postpartum Psychosis: The Birth of a New Defense?*, 6 Cooley L. Rev. 323 (1989); John Dent, *Postpartum Psychosis and the Insanity Defense*, 1989 U. Chi. Legal F. 355 (1989); Anne Damante Brusca, *Postpartum Psychosis: A Way Out for Murderous Moms?*, 18 Hofstra L. Rev. 1133 (1990); Debora K. Dimino, *Postpartum Depression: A Defense For Mothers Who Kill Their Infants*, 30 Santa Clara L. Rev. 231 (1990); Christine Anne Gardner, *Postpartum Depression Defense: Are Mothers Getting Away with Murder?,* 24 New Eng. L. Rev. 953 (1990); Jennifer L. Grossman, *Postpartum Psychosis-A Defense to Criminal Responsibility or Just Another Gimmick?*, 67 U. Det. L. Rev. 311 (1990); Laura E. Reece, *Mothers Who Kill: Postpartum Disorders and Criminal Infanticide,* 38 UCLA L. Rev. 699, 701 (1991); Megan C. Hogan, *Neonaticide and the Misuse of the Insanity Defense,* 6 Wm. & Mary J. Women & L. 259, 285-286 (1999); Velma Dobson & Bruce Sales, *The Science of Infanticide and Mental Illness,* 6 Psychol. Pub. Pol'y & L. 1098, 1106 (2000) (Arizona professors noting that "[p]ostpartum psychosis often involves hallucinations or delusions, severe depression, and thought disorder").

[3]      *See* Ann Japenga, *Ordeal of Postpartum Psychosis: Illness Can Have Tragic Consequences for New Mothers,* L.A. Times, Feb. 1, 1987; Maud S. Beelman, *Mother Convicted of Murdering Baby: Killing Spurs Debate on Postpartum Depression,* L.A. Times, May 10, 1987; Marianne Yen, *High-Risk Mothers; Postpartum Depression, in Rare Cases, May Cause an Infant's Death,* Wash. Post, Aug. 23, 1988; Constance L. Hays, *Mother on Trial in 2 Deaths Had Postpartum Psychosis, Lawyer Says,* N.Y. Times, Sept. 7, 1988; Eric Lichtblau, *Postpartum Psychosis Key to Murder Defense,* L.A. Times, Sep. 24, 1988; Eric Lichtblau, *Expert: Massip Suffered Classic Maternal Psychosis,* L.A. Times, Oct. 20, 1988; Mary Peterson Kauffold, *After Birth is There a Better Way to Treat Postpartum Disorders?*, Chi. Trib., Jul. 9, 1989; *Mom Who Drowned Baby Acquitted as Mentally Ill,* Orlando Sentinel, Sep. 12, 1991 ("[The] judge said the woman may have suffered from postpartum psychosis"); *Mother Innocent in Baby's Death,* Bos. Globe, Sep. 12, 1991; Anna Cekola, *Mother Faces Trial in Death of Newborn*, L.A. Times, Jan. 21, 1997 ("Postpartum psychosis gained national attention as a legal defense nearly 10 years ago").

*Confession*, aired nationally less than three months after King's arrest. Featured as an expert was Dr. Diane Barnes, the same medical expert hired over 15 years later by King's PCR counsel.

¶16        The PCR court ultimately held an evidentiary hearing on King's "newly discovered scientific evidence" claim in 2017. Her PCR counsel conceded that postpartum psychosis was a known and diagnosed condition well before King's trial but argued that "[w]hat has changed is how widely known, researched and understood the diagnostic presentation [and] the symptom presentation" have become. The PCR court heard testimony from King and Peterson, her defense attorney. Although she denied them in 2001, King now told the PCR court she had suffered from postpartum delusions and hallucinations after childbirth, adding that violent and "weird" visual images and voices would "pop into [her] head."

¶17        The PCR court heard from three medical experts. Dr. Hibbert and Dr. Barnes testified on King's behalf, and Dr. Steven Pitt testified for the prosecution. All three medical experts agreed "it was possible to have diagnosed King properly in the 2001 time frame." Based on King's jail medical records, Dr. Barnes opined that King suffered from "bipolar disorder with psychotic features" in 2001. Dr. Barnes acknowledged that postpartum psychosis had been recognized for "hundreds and hundreds and hundreds of years," but noted how "the scope of symptoms has broadened considerably since 2001." Yet, Dr. Barnes still avowed that she "personally" could have diagnosed King before her 2002 criminal trial. For her part, Dr. Hibbert opined that "a postpartum woman" is more likely "to get an accurate diagnosis today" than in 2002, but she agreed with Dr. Barnes that King "could have" been diagnosed in 2001 "[w]ith the right person evaluating."

¶18        Dr. Pitt, a local forensic psychiatrist, testified that "postpartum psychosis" is merely a label for "a series of psychotic symptoms" and "[t]here's nothing new or different about psychotic features in 2002 than . . . today." Then and now, he claimed that a reasonable mental health professional would have asked whether King presented "psychotic symptomatology" or "experienced perceptual disturbances, either visual or auditory." Dr. Pitt further opined that no "special experience" was needed to diagnose this form of psychosis and the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") "does not affect the understanding or recognition of the psychotic symptomology."

¶19        The PCR court granted King's petition in a minute entry. On one hand, the court acknowledged that postpartum psychosis was a known

and diagnosed condition long before King's 2002 trial, and all three PCR medical experts agreed that King could have been diagnosed in 2002. Even so, the court found that King's 2010 diagnosis was newly discovered evidence, pointing to "advancements in understanding postpartum psychosis."[4] From this judgment, the State appeals.[5]

## DISCUSSION

**¶20** Arizona Rule of Criminal Procedure 32.1(e) provides that a convicted defendant can obtain a new criminal trial if "newly discovered material facts probably exist, and those facts probably would have changed the judgment or sentence." Ariz. R. Crim. P. 32.1(e). A fact is "newly discovered" only if (1) it was discovered after trial or sentencing, (2) the petitioner exercised due diligence to discover it before trial, and (3) it is material and not merely cumulative or solely for impeachment. *Id.* at (e)(1)–(3); *see also State v. Amaral*, 239 Ariz. 217, 219, ¶ 9 (2016). Our supreme court has described this ground for post-conviction relief as "disfavored" and warned courts to proceed "cautiously" before granting new trials based on newly discovered evidence. *State v. Serna*, 167 Ariz. 373, 374 (1991).

**¶21** We review the PCR court's grant of post-conviction relief for an abuse of discretion and its findings of fact for clear error. *State v. Pandeli*, 242 Ariz. 175, 180, ¶¶ 3-4 (2017). An abuse of discretion includes both legal error and a PCR court's failure to "adequately investigate the facts necessary to support its decision." *Id.* at ¶ 4. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Burr*, 126 Ariz. 338, 339 (1980) (citations omitted). We defer to the PCR court's credibility evaluations of witnesses who testified at the PCR hearing. *State v. Fritz*, 157 Ariz. 139, 141 (App. 1988).

---

[4]     The PCR court described the 2010 diagnosis as a "2015 diagnosis" based on 2015 "medical wisdom."

[5]     By all accounts, the PCR court's order represented a first. All 50 states have similar post-conviction relief rules that permit convicted defendants to obtain a new trial based on newly discovered material evidence. Yet no one—not the PCR court, not King and not the dissent—has pointed to even one published or unpublished case in which any court from any state has granted a new trial based on medical advancements in the science of postpartum depression or psychosis.

¶22      On this record, we reverse. The decision of the PCR court misinterpreted and misapplied the requirements of Rule 32.1(e), and the PCR court did not account for uncontested facts conflicting with the decision.

### A.    King's 2010 Diagnosis Was Not A Newly Discovered Material Fact

     1.     *The PCR court misinterpreted and misapplied Rule 32.1(e) and Arizona decisional law*

¶23      The State argued that King's 2010 diagnosis was not "newly discovered" evidence under Rule 32.1(e) because she raised a disorder that was known to and diagnosed by "mental-health experts" before her trial. The PCR court rejected the State's interpretation as "unyielding," "rigid," and "undu[ly] focused on the fact that postpartum psychosis was a recognized medical condition." Instead, the PCR court first examined the second requirement of Rule 32.1(e) and then concluded King "met her evidentiary burden" because "neither [her] nor her counsel, through the exercise of reasonable diligence, could have understood and therefore discovered her postpartum psychosis at the time of trial."[6]

¶24      This was legal error. To secure post-conviction relief, King had the burden to prove *each* requirement of Rule 32.1(e), beginning with "the first requirement" that her post-conviction diagnosis was "in fact" newly discovered and ending there if unproven. *State v. Bilke*, 162 Ariz. 51, 53 (1985) (describing the "first requirement" as whether the proffered evidence is newly discovered); *Serna*, 167 Ariz. at 374; *State v. Harper*, 823 P.2d 1137, 1143-44 (Wash. App. 1992) (holding that due diligence prong "need[] not be addressed" where new psychiatric opinion did not meet first prong). By inverting or collapsing this first requirement and the second requirement of reasonable diligence, the PCR court took a deep,

---

[6]      We do not suggest the first and second requirements are unconnected. Petitioners who present a previously unknown medical condition would necessarily satisfy the due diligence requirement. *See Amaral*, 239 Ariz. at 220-21, ¶ 14.

unnecessary and futile dive into whether King and her defense attorney performed due diligence to locate the 2010 diagnosis before her 2002 trial.[7]

¶25 The PCR court's approach also conflicts with Arizona decisional law. Our supreme court has twice considered whether a post-conviction medical diagnosis or scientific advancement presented "newly discovered" evidence. *See Amaral*, 239 Ariz. 217; *Bilke*, 162 Ariz. 51.

¶26 *Bilke* came first. Petitioner Bilke was diagnosed with post-traumatic stress disorder ("PTSD") in 1987, more than ten years after his 1974 conviction. The supreme court held that Bilke presented a colorable claim for post-conviction relief based on the post-trial diagnosis, reasoning that the disorder and now-common acronym were unknown to medical science when Bilke was tried and convicted and that Bilke "could not have been diagnosed until years after [his] trial." *Amaral*, 239 Ariz. 217, 221, ¶ 18 (discussing *Bilke*).

¶27 King cannot meet the *Bilke* standard. The record shows that postpartum psychosis was recognized and diagnosed by medical science for hundreds if not thousands of years prior to King's trial, and the disorder had been raised as a defense by defendants accused of similar crimes for decades.

¶28 *Amaral* later confirmed *Bilke*'s holding. Petitioner Amaral was convicted of various felonies; each committed as a juvenile. *Id.* at 218, ¶ 2. Amaral moved for post-conviction relief in 2012 based on scientific advancements in juvenile psychology and neurology since his 1993 trial. *Id.* at 219, ¶ 6. The supreme court held that "advances in juvenile psychology and neurology" were not newly discovered evidence because "juvenile behavioral tendencies and characteristics were generally known [before Amaral's trial], and the trial judge contemplated Amaral's youth and attendant characteristics" and "personal idiosyncrasies" at sentencing. *Id.* at 219, 221, ¶¶ 8, 17.

---

[7] The dissent contends that whether evidence is "newly discovered" is not a "threshold question" under Rule 32.1(e), "but rather, must be considered concurrently with the rest of the elements," citing *Bilke* in support. *Infra* ¶ 76 n. 17. That argument, however, conflicts with *Bilke* and *Amaral*, neither of which envisions or articulates a free-floating balancing test that implicates all elements at once. To the contrary, *Bilke* described the "first requirement" as showing "the evidence [is] newly[] discovered." 162 Ariz. at 53.

¶29　　　　Most important here is how *Amaral* framed, contrasted and applied *Bilke*:

> Unlike Amaral, Bilke suffered from a condition that existed at the time of the trial but was not yet recognized by mental health professionals and, consequently, could not have been diagnosed until years after the trial. Thus, at the time of sentencing, it would have been impossible for the trial judge in *Bilke* to have assessed the petitioner's actions in light of his disorder. In contrast, Amaral's juvenile status and impulsivity were known at the time of sentencing and were explicitly considered by the trial judge. Hence, his condition was not newly discovered.

*Id.* at 221, ¶ 18.

¶30　　　　*Amaral* does not help King's petition. First, King and her defense attorney in fact urged the sentencing judge in 2002 to consider her actions in light of her disorder. Second, just as Amaral offered evidence based on "*advances* in juvenile psychology and neurology" that "supplement[ed] then-existing knowledge of juvenile behavior," *id.*, ¶ 17 (emphasis added), King offers "*advancements* in understanding postpartum psychosis" that supplement or confirm then-existing knowledge of postpartum behavior. Applied here, *Amaral* teaches that "newly discovered" evidence:

- Does *not* mean broadened research into supplemental diagnostic criteria, even if it reduces the likelihood of misdiagnosis;

- Does *not* mean a greater professional awareness or appreciation of suspected risks and known mental disorders, even if this development bolsters or perfects a previously available but marginal defense; and

- Does *not* mean expanded training or the geographic assimilation of specialized knowledge from experts in California to generalists in Arizona, even if this development increases the chances of diagnosis.

*See, e.g.*, *Henry v. State*, 125 So. 3d 745, 750-51 (Fla. 2013) (newly discovered evidence is not a revised medical definition drawn from "decades of advancement in neuroscience"); *Shuman*, 836 N.E.2d at 1090-91 (newly discovered evidence is not advancements reported in medical, scientific and academic circles); *McSwain*, 676 N.W.2d at 258 (Murray, J., concurring)

(distinguishing between newly discovered evidence and "an argument that the *materiality* of the evidence is newly discovered"); *State v. Fosnow*, 624 N.W.2d 883, 886 (Wis. App. 2001) (newly discovered evidence is not a "new appreciation" of known but unused evidence).

**¶31**        This approach accounts for real-world issues and interests, enabling courts to balance the perpetual evolution of behavioral science against the constitutional rights of defendants and victims, along with the critical interest in finality. *See State v. Miles*, 243 Ariz. 511, 519, ¶ 35 (2018) (Pelander, J., concurring) (allowing a petitioner to seek relief "decades later based solely on newly discovered mental-health evidence and expert opinions[] seems at odds with [the] interests of finality and victim rights."); *see also* Ariz. Const. art. 2, § 2.1(A)(10) ("To preserve and protect victims' rights to justice and due process, a victim of crime has a right" to a "prompt and final conclusion of the case after the conviction and sentence"); *State v. Mata*, 185 Ariz. 319, 337 (1996) ("If we were to accept defendant's present arguments, this case and others like it[] would go on indefinitely.").[8]

> 2.        *Evidence is not "newly discovered" simply because it was not introduced at trial or sentencing*

**¶32**        The PCR court deemphasized *Amaral* as mere confirmation of "well-settled principles regarding newly discovered evidence" that facts cannot be newly discovered if already presented and considered at trial. *Amaral* held, however, that "advances in juvenile psychology and neurology" are not "newly discovered material facts" under Rule 32.1(e) "*because* juvenile behavioral tendencies and characteristics *were generally known in 1993.*" *Amaral*, 239 Ariz. at 221, ¶ 17 (emphasis added); *see also Foster v. State*, 132 So. 3d 40, 72 (Fla. 2013) ("Most importantly, new research studies are not recognized as newly discovered evidence.").

**¶33**        A medical diagnosis is not new evidence under Rule 32.1(e) merely because it was not introduced at a defendant's trial. After all, criminal defense attorneys have many reasons for not introducing evidence, often purely strategic. *See, e.g.*, Amy L. Nelson, *Postpartum*

---

[8]        The dissent deems *Amaral* less significant, countering that "[o]f course, advancements or changes in understanding of a condition, by themselves, cannot constitute newly discovered evidence," but concluding that King offered "significant advances [which] may allow the condition to be *diagnosed.*" *Infra* ¶ 89 (emphasis added). That confuses the issue. The diagnosis only exists *because* of the alleged scientific advances, which purportedly enabled and justified the diagnosis. They cannot be separated.

*Psychosis: A New Defense?*, 95 Dick. L. Rev. 625, 635 (1991) (warning that "[j]udges and juries may also hesitate to acquit a woman suffering from postpartum psychosis because there is a natural tendency to sympathize with the deceased infant," and "most lawyers representing women in postpartum infanticide cases have declined to advocate for a specialized defense based on postpartum psychosis.").

¶34        If unused evidence is newly discovered evidence, then criminal defendants could indefinitely preserve their Rule 32.1(e) arguments "simply by not introducing generally known" material facts at trial or sentencing. *See Mata*, 185 Ariz. at 333 ("Simply because [a] defendant presents the court with evidence for the first time does not mean that such evidence is 'newly discovered.'"); *Commonwealth v. Shuman*, 836 N.E.2d 1085, 1091-92 (Mass. 2005) (distinguishing "newness" of evidence from whether the evidence was presented at trial).

> 3.        *The PCR court conflated "newly discovered" evidence with a wider acceptance or dissemination of previously available evidence*

¶35        The PCR court found the diagnosis was "newly discovered" evidence because "advancements in understanding postpartum psychosis" have since shown that "a combination of bipolar disorder and PTSD could result in psychotic episodes in peripartum women like King." The record, however, shows this evidence was available before King's trial from an unknown number of medical professionals who had already made the connection between postpartum psychosis, bipolar disorder and PTSD. Just consider the testimony of King's medical experts:

- Although Dr. Barnes testified that bipolar disorder has been conclusively recognized as evidence of postpartum psychosis since King's trial, she acknowledged that bipolar disorder was still a "red flag" for postpartum psychosis before King's trial.

- Dr. Hibbert testified that the connection between bipolar disorder and postpartum psychosis was recognized by a definitive publication in 2007, but also testified that "a few different studies" had made the connection before King's trial.

- Dr. Hibbert testified that "a definite link" now exists between trauma and postpartum psychosis. But Dr. Hibbert also testified that mental health professionals might have previously drawn the connection.

¶36 In sum, by 2002, medical science had connected King's symptoms to postpartum psychosis—at least in Southern California. Even if later confirmed, the uncontested record shows that medical science had long suspected a link between postpartum psychosis and the "constellation" of bipolar disorder and PTSD.

4. *New experts and assimilated knowledge do not convert old evidence into newly discovered evidence*

¶37 Rule 32.1(e) demands that petitioners offer actual new evidence to secure a new trial in post-conviction proceedings—*not* for PCR counsel to unearth new experts after trial who examine the same record as their pretrial counterparts and reach different conclusions, especially when the petitioner could have hired these same post-conviction experts before trial.

¶38 First, a petitioner does not get a new criminal trial "simply because [she] found a new expert who reached conclusions different from those of the expert appointed during trial." *Foster*, 132 So. 3d at 60 (citations omitted); *Harper*, 823 P.2d at 1143 (rejecting post-conviction psychiatric diagnosis as newly discovered evidence where petitioner simply "retains a new expert, who reviews the same evidence, and presents a new opinion"); *cf. Kreisman v. Thomas*, 12 Ariz. App. 215, 222 (1970) (testimony of a new expert witness is not newly discovered evidence). That is especially true when, as here, the new expert was a prominent, experienced California doctor of psychology who testified that she could have "personally" diagnosed King with the same disorder in 2001. The record proves at most that Dr. Barnes was more experienced and qualified in 2001 than Dr. Rosengard, which is not a recognized legal basis for a new trial under Rule 32.1(e). *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired.").

¶39 "[C]redible experts" often reach different conclusions based on "good faith disagreements." *Pandeli*, 242 Ariz. at 192, ¶ 74. Divergent expert opinions are even more likely here—in the inexact and fluctuating sphere of mental health, where existing disorders are routinely modified and new disorders are routinely recognized, *see* John P. Vincent et al., *Psychological Trauma: What Every Civil Litigator Needs to Know*, 53 Hous. Law. 22, 22-23 (Aug. 2015), and where medical advancements or revised diagnostic criteria "may mask vigorous debate within the psychiatric profession about the very contours of the mental disease itself," *Clark v. Arizona*, 548 U.S. 735, 774-75 (2006). Just consider the conflicting opinions

of King's post-conviction experts, Drs. Hibbert and Barnes, who each diagnosed King as suffering from postpartum psychosis in 2001 but for different reasons. Hibbert diagnosed King as having a "brief psychotic disorder with postpartum onset" based on the DSM-4, while Barnes diagnosed King as suffering from a "bipolar disorder with psychotic features" based on the DSM-5. Simply stated, the presence of dueling expert opinions should not be confused with the "newly discovered material facts" that guarantee a new trial under Rule 32.1(e).

¶40 Second, old evidence does not morph into new evidence after crossing state lines. The PCR court mistook "newly discovered material facts" for something known in California *before trial* that was assimilated and became known in Arizona *after trial*. The record is plain and uncontested. "With [her] expertise in this field," Dr. Barnes said that she could have diagnosed King as suffering from postpartum psychosis in 2001 or 2002, when Dr. Barnes worked out of her Southern California office and already enjoyed a national reputation, having just appeared on a national cable network.

### 5. *A diagnosis based on then-existing but unshared facts is not newly discovered*

¶41 King's medical experts in the PCR proceeding agreed that medical science had long associated certain traditional symptoms with postpartum psychosis, including hallucinations and delusions. According to Dr. Barnes:

> A reasonable clinician diagnosing Hope King in 2001 would have had a rather limited understanding of the symptom presentation of a postpartum psychotic episode in order to diagnose her at that time, relying predominantly on the presence or absence of auditory hallucinations and delusions as Dr. Steven Pitt did in his clinical conclusions.

¶42 But King testified that she suffered those traditional symptoms at her PCR evidentiary hearing in *2017*. She recounted the postpartum delusions and hallucinations, describing "weird [and] odd things that would pop into [her] head." She heard voices inside her head, which directed her to harm the infant, and recounted a disturbing vision in which she left the infant in the street in a stroller and "cars just running us over and bodies, blood, everything everywhere."

¶43        And yet, when interviewed by her pretrial expert in January *2002*, King denied having "auditory or visual hallucinations" and "showed no psychotic thought process." Only later, in 2010 and 2016, would King share these frightening 2001 episodes with her PCR medical experts, including the disturbing images and "evil" voices directing her to "bite" or starve the infant. King also confided to Dr. Hibbert that she "was suicidal [in 2001] but didn't tell anyone."

¶44        This uncontested record shows that King could have been diagnosed with postpartum psychosis before her 2002 trial, even under the "rather limited understanding of the symptom presentation" at the time, but she denied the symptoms when examined by Dr. Rosengard in January 2002. King cannot manufacture or preserve an argument of newly discovered evidence by selectively sharing different information with mental health experts *before* and *after* trial. "It would work havoc on the system if we held that information possessed by the defendant during the trial is 'newly-discovered' when revealed by him after the trial." *Saenz*, 197 Ariz. at 491, ¶ 13 (quoting *State v. Mabry*, 630 P.2d 269, 275 (N.M. 1981)). At bottom, "[i]f anyone was in a position to provide the numerous psychologists . . . with the background information to which defendant now points, it was [the] defendant [her]self." *Mata*, 185 Ariz. at 333 ("A careful review of the voluminous record in this case reflects that all of the evidence as to defendant's history was available to defendant and [her] counsel" from the moment of her arrest.). King prevented Dr. Rosengard from discovering her postpartum psychosis. And her reluctance to share these private, painful thoughts is no excuse, even if understandable.

¶45        Compounding the error, the PCR court appropriated real meaning and significance from Dr. Rosengard's missed diagnosis in January 2002, finding it "highlight[s]" how the medical community lacked the knowledge to diagnose postpartum psychosis in 2002 because it lacked "the benefits of 2015 medical wisdom." The PCR court reasoned that Dr. Rosengard found no psychosis because he was without the "benefit [of] 2015 wisdom" and future advancements. So too, King's defense attorney "surely" could not have been "expected to" recognize the disorder when a trained physician could not.[9]

---

[9]        The PCR court did not mention Dr. Hibbert's unvarnished criticism of Dr. Rosengard for missing the "obvious" diagnosis in January 2002. *See Pandeli*, 242 Ariz. at 180, 182, ¶¶ 4, 15; *People v. McSwain*, 676 N.W.2d 236, 253 (Mich. App. 2003) ("Failure to recognize a reasonably discoverable

**CONCLUSION**

¶46        We reverse the PCR court's order granting post-conviction relief.

**B R O W N**, Judge, dissenting:

¶47        The State seeks review of the PCR court's order (1) finding that the diagnosis of postpartum psychosis King obtained in 2010 constitutes newly discovered evidence that probably would have changed her 2002 jury verdict to guilty except insane ("GEI"), and (2) granting her a new trial. After conducting an evidentiary hearing consistent with the express mandate of this court, the PCR court issued its order, which included various findings of fact. The State does not challenge any of those factual findings on appeal; instead, it raises a legal issue: whether the court erred by failing to follow *State v. Amaral*, 239 Ariz. 217 (2016), when it concluded that King's diagnosis constituted newly discovered evidence even though postpartum psychosis was a recognized and diagnosable condition at the time of trial.

¶48        As shown below, my analysis focuses on what the State has actually argued in its petition for review—that *Amaral* precludes King's claim under Arizona Rule of Criminal Procedure ("Rule") 32. I therefore disagree with the majority's decision to (1) analyze issues, findings, and evidence not challenged or even mentioned by the State in its petition for review, (2) frame the evidence in the light most favorable to the State, (3) reweigh the evidence presented to the PCR court, and (4) disregard the PCR court's factual findings and credibility determinations. Because the PCR court properly weighed the relevant facts and applied the relevant law, the State has not demonstrated the court abused its discretion. I would therefore accept review, but deny relief.

---

mental illness is not enough to require a grant of postjudgment relief, especially a number of years later.").

## FACTUAL AND PROCEDURAL BACKGROUND

¶49        If, as the majority claims, the law under Rule 32.1(e) is so clear and *Amaral* so dispositive, there is no need for the majority's factual analysis, especially when the State's petition for review of the PCR court's ruling does not challenge a single factual finding that court made. And though I think much of the issue before us is a question of law, I begin by providing a summary of the facts because the majority omits relevant procedural events and focuses only on the evidence it thinks undercuts the PCR court's analysis and findings.

¶50        In 2001, King called 9-1-1 about her infant daughter, and paramedics arrived to find the child unresponsive, pale, and barely breathing. The child was treated for multiple serious injuries. Because many of the injuries were in various stages of healing, the evidence suggested they were inflicted on multiple occasions. The State charged King with attempted second-degree murder and eight counts of child abuse.

¶51        King was evaluated for mental health issues while she was held before trial in the Maricopa County Jail. Although the resulting records indicate King had various depressive and adjustment disorders, and that bipolar and borderline personality disorders were considered, the records do not indicate King was diagnosed with or treated for a psychotic disorder.

¶52        Bruce Peterson, King's lead counsel during trial and sentencing, testified he was generally aware in 2001 and 2002 that "women could develop postpartum mood disorders," and that women with these "disorders could harm their children." Based on his experience and meetings with King, as well as the nature of the offenses, he thought King "may have [had] mental [health] issues that were relevant to the case." To determine whether he could pursue a mental health related defense and a mitigated sentence, he retained Dr. Rosengard.

¶53        After reviewing various medical records and meeting with King, Rosengard issued a detailed report, diagnosing King with, inter alia, depression, "social phobia, generalized anxiety disorder, posttraumatic stress disorder, and polysubstance abuse and dependence." He indicated that "[a] multidisciplinary approach to [King's] problem would be important," and concluded by expressing confusion over King's statements regarding the abuse of her daughter.

¶54        After consulting with Rosengard, Peterson sought out a second expert, Dr. Levy, because, among other things, he wanted an expert in postpartum mood disorders to determine whether King had any "postpartum issues."  Though the record is scant as to Levy, it reflects he completed a "postpartum evaluation," and his invoice to Peterson shows he was a "Diplomate in Psychiatry with Subspecialty Certification in Forensic Psychiatry" and he reviewed multiple records "with regard to psychiatric issues."[10]  Peterson considered raising an "affirmative defense" but ultimately decided against it, concluding the "postpartum evaluation" resulted in a finding that King "fell short of the diagnosis of postpartum depression."  No evidence showed Levy diagnosed King with postpartum psychosis or any other psychotic disorder.

¶55        At trial, King did not testify and no expert opined on her mental health.  The jury convicted King of the child abuse charges but was unable to reach a verdict on the attempted murder charge.  At sentencing, the superior court considered King's mental health issues that were known at the time.  The court then sentenced King to a mitigated 40-year prison sentence, to be followed by probation for 15 years.

¶56        On appeal, this court affirmed King's convictions and sentences. *State v. King* ("*King I*"), 1 CA-CR 02-0889 (Ariz. App. Oct. 9, 2003) (mem. decision).   King then challenged the constitutionality of her sentences in a PCR petition, which this court denied. *State v. King* ("*King II*"), 1 CA-CR 05-0439-PRPC (order filed Jan. 6, 2006); Rule 32.1(e).

¶57        In 2009, Dr. Hibbert, a clinical psychologist specializing in maternal mental health, examined King and later provided an expert opinion regarding the possibility of postpartum mental illness at the time of King's criminal acts.  Hibbert's clinical evaluation report stated, "It is clear [King] was under the influence of perinatal mental illness in pregnancy and the months following childbirth."  The report suggested several possible diagnoses of perinatal mental illness, including "Brief Psychotic Disorder, with postpartum onset, moderate to severe, (or Postpartum Psychosis)," using the Diagnostic and Statistical Manual of

---

[10]        If Levy issued a report on the postpartum evaluation, it is not in the record before us.

Mental Disorders ("DSM")-IV (the DSM-V had not yet been released).[11] Hibbert concluded that "King was under the influence of a severe mental illness—Postpartum Psychosis—at the time of the incidents of 2001, meaning she would not have been able to distinguish 'right' from 'wrong,' as she was, in essence, under the influence of a 'temporary madness.'"

¶58     Relying on Hibbert's opinion, King filed an amended PCR, requesting an evidentiary hearing and a new trial on the ground that her recent diagnosis of postpartum psychosis was newly discovered evidence that would probably change her verdicts to GEI under A.R.S. § 13-502(A), (C), which requires clear and convincing evidence that at the time King committed the acts of child abuse she was afflicted with a mental disease or defect of such severity that she did not know the criminal act was wrong. King's petition also alleged actual innocence and conditional ineffective assistance of counsel.

¶59     The PCR court denied the petition without a hearing, finding in part that the diagnosis of postpartum psychosis was not a newly discovered material fact, and that King did not exercise due diligence in securing the "newly discovered material facts." This court accepted review and granted relief in part. *State v. King* ("*King III*"), 2 CA-CR 2015-0140-PR, 2015 WL 3749686, at *5, ¶ 17 (Ariz. App. June 12, 2015) (mem. decision). We explained that although King conceded her "postpartum psychosis was a known medical condition . . . it does not necessarily follow that trial counsel would have discovered the diagnosis with the exercise of reasonable diligence." *Id.* at *2, ¶ 7. Because King's factual assertions presented a colorable claim, we remanded to the PCR court, directing it to "conduct an evidentiary hearing to determine whether King or her counsel in the exercise of reasonable diligence could have discovered at the time of trial the diagnosis of postpartum psychosis and, if not, whether presentation of Hibbert's testimony would probably change the verdict." *Id.* at *3, ¶ 12 We denied relief on King's other two claims, and our supreme court denied the State's subsequent petition for review.

¶60     The State then retained Dr. Pitt to evaluate King. He concluded, based on the DSM-IV, that King had "Major Depressive Disorder, Severe, with Possible Psychotic Features, Postpartum Onset" when she abused her daughter. He also stated that King did not have

---

[11]     Unless otherwise noted, for ease of reference, I use the term "postpartum psychosis" throughout this dissent, recognizing that the condition as diagnosed may be described in more precise terms.

malingering amnesia, meaning she did not give false symptoms or grossly exaggerate her symptoms. Pitt opined nonetheless that King's condition "was not of such severity that she was unable to know that her criminal acts were wrong," largely basing his conclusion on the statements she made and behaviors she exhibited during police interrogation and in other situations before trial.

¶61 In 2016, King was evaluated by Dr. Barnes, a psychotherapist specializing in women's reproductive mental health. She diagnosed King as having postpartum psychosis at the time of her criminal offenses; stated in DSM-V terms, King had "Bipolar I Disorder, with psychotic features, with peripartum onset" and "Posttraumatic Stress Disorder [("PTSD")], dissociative subtype." Barnes expounded extensively on how the understanding of postpartum psychosis had evolved since King's trial and opined that the lack of understanding affected King's ability to obtain a proper diagnosis before trial.

¶62 The parties submitted prehearing memoranda to the PCR court addressing the two issues identified in *King III.* The *King III* decision specifically directed that court to consider whether King or her counsel, in the exercise of reasonable diligence, could have discovered the condition of postpartum psychosis. The State, however, chose to focus its efforts primarily on its argument, based on *Amaral*, that King could not prevail because her condition was recognizable and diagnosable when she was convicted. According to the State, and notwithstanding *King III*, the supreme court's decision in *Amaral* compelled the PCR court to determine as a matter of law that King's diagnosis could not constitute newly discovered evidence because "postpartum psychosis was a known medical condition at the time of her trial."

¶63 At the evidentiary hearing, the PCR court heard testimony from Hibbert, Barnes, and Pitt, as well as testimony from King and Peterson.[12] The State has not offered any evidentiary challenges to the testimony presented at the four-day hearing or the numerous exhibits admitted in evidence. Nevertheless, a brief overview of the evidence is useful in understanding the context of the legal argument the State makes based on *Amaral*.

---

[12] Notwithstanding the seemingly narrow remand order in *King III*, nothing in the record indicates the State objected to Barnes' reports or testimony.

¶64     Addressing whether King could have been diagnosed with postpartum psychosis in 2002, Pitt opined that the condition is merely "a label" to describe a "series of symptoms that speak to psychotic features," and there was "nothing new or different about psychotic features in 2002 than . . . there are today." He therefore asserted a reasonable mental health professional in 2002 "would have considered a constellation of symptoms that . . . included something along the lines of postpartum psychosis." According to Pitt, no special experience was needed to "diagnose someone who is postpartum who becomes depressed who then may or may not have some psychotic features," and that even "a third-year medical student could do this."

¶65     By contrast, Barnes testified about the medical community's awareness of postpartum psychosis in 2001. Recognizing that the condition had been observed at least since the time of Hippocrates, Barnes explained that "in terms of symptom presentation, there have been enormous changes and the scope of the symptoms has broadened considerably since 2001." Accordingly, she testified, a doctor in 2001 might have identified that a patient suffered from a number of different issues, but he or she "wouldn't have concluded that [the diagnosis] was postpartum psychosis." To illustrate, Barnes analyzed Rosengard's pretrial mental health evaluation of King. Rosengard gave King "a number of different diagnoses," but did not (1) consider the possibility that she had a peripartum-onset mental illness, (2) analyze the trauma in her background, or (3) discuss possible signs of dissociation, all of which are relevant considerations for identifying postpartum psychosis. Barnes opined that this lack of understanding about postpartum psychosis affected King's ability to obtain a diagnosis before trial. For example, Barnes focused on the condition's "waxing and waning [symptom] presentation," which she explained is

> a very important part of . . . a postpartum psychotic episode in that women can look very lucid in one moment, and then, in another moment, their reality is unraveling. So it's . . . like women can live in two realities, two different realities simultaneously.
>
> . . . .
>
> But when you look at women with postpartum psychosis, they could look perfectly fine on the outside and you would have no sense of what might be going on . . . inside.

¶66        Barnes opined further that at the time of her offenses, King suffered from dissociation and dissociative amnesia, which "were not really part of the picture" in 2001.  The understanding in 2001 was "narrow" or "traditional," in that it was thought that a psychotic disorder must involve hallucinations and delusions.  Barnes explained it is now understood that the symptoms of postpartum psychosis wax and wane, and her symptoms increased and decreased in intensity and severity.  In one reality, King appeared lucid and acted lovingly toward her child, but then in the other reality—the dissociative episodes—she severely harmed her child.  She testified that practitioners now understand that women often do not remember the dissociative episodes.

¶67        Barnes also opined that even though King's psychosis was not diagnosed before trial, King had bipolar disorder with psychotic features, which is "significant for a diagnosis of postpartum psychosis" because of the link between bipolar disorder and postpartum psychosis.  She explained, however, that limited knowledge of that link in the field in 2001 would have made it difficult for a clinician to use bipolar disorder to draw a more definitive diagnosis of postpartum psychosis.

¶68        According to Barnes, King had a long history of trauma, such as childhood sexual abuse and a traumatic birth experience in which her placenta was ripped from the uterine wall, resulting in profuse bleeding and a "radical abdominal hysterectomy."  Barnes testified that how this history affected King's mental health was not well recognized at the time of her trial.  Although King was diagnosed with PTSD at the time of trial, she was not diagnosed with PTSD with a dissociative subtype, which, Barnes testified, was a significant part of her postpartum psychosis.  The DSM-IV, which was used to diagnose King before trial, "did not acknowledge that dissociation is a very important outcome of women who have experienced trauma," and only recently has the causal connection between trauma and psychosis been understood.  Additionally, she noted, recent research shows that a traumatic birth experience involving hemorrhaging and a hysterectomy is a predictor of postpartum psychosis.

¶69        Barnes added that King's psychotic symptoms began in the last trimester of her pregnancy, the timing of which now is considered a precursor and significant predictor of psychotic symptoms in the postpartum period.  Barnes explained that at the time of King's trial, onset was believed to occur only in the postpartum period, but today, it is understood that onset may occur in the last trimester of pregnancy.  Barnes concluded that a doctor in 2001 might have identified that a patient suffered

from several different issues, but he or she "wouldn't have concluded that [the diagnosis] was postpartum psychosis."

¶70　　　　Hibbert explained that at the time of King's trial, "there simply was not enough research and provider education for many practitioners to fully comprehend the wide range of symptoms that fall into the category of Perinatal Mood Disorders," and "there were few who could have given [King] the proper evaluation she deserved" at the time of her arrest and trial. Hibbert agreed with Barnes' findings, describing the symptomology of postpartum psychosis and emphasizing that the condition may involve waxing and waning. Hibbert explained that moving in and out of a psychotic state is significantly different than the type of psychosis where a person continuously maintains "bizarre behavior at that intense level." Hibbert testified that when a mother is in the psychotic state, she would not understand that her thoughts of harming her child or herself were wrong.

¶71　　　　In its comprehensive ruling, the PCR court found that King "met her evidentiary burden . . . [and] that neither King nor her counsel, through the exercise of reasonable diligence, could have understood and therefore discovered her postpartum psychosis at the time of trial." The court also found that presenting such evidence to the jury probably would have changed the jury's verdicts to GEI. In reaching these conclusions, the court weighed the credibility of Hibbert, Barnes, and Pitt and found the opinions of King's experts, particularly Barnes, more compelling. The court therefore concluded King was entitled to relief under Rule 32.1 and ordered a new trial.

¶72　　　　The State then petitioned for review in this court, asserting (1) the PCR court "erred by failing to follow *Amaral* and concluding that King's recent diagnoses constituted newly discovered evidence, despite the conditions being recognized and diagnosable at the time of her trial"; (2) the court "erred by failing to consider whether King had acted diligently in pursuing her newly discovered evidence claim" *after trial*; and (3) the court "erred by failing to make the necessary factual findings" that "King's recent diagnoses probably would have resulted in a guilty except insane verdict."

**ANALYSIS**

¶73　　　　Under Rule 32.1(e), King is entitled to post-conviction relief only if "newly discovered material facts probably exist, and those facts probably would have changed the judgment or sentence." "[R]equests for

a new trial based on newly discovered evidence are disfavored and should be granted cautiously." *State v. Saenz*, 197 Ariz. 487, 490, ¶ 13 (App. 2000).

¶74 In reviewing a PCR petition, we defer to "the sound discretion" of the PCR court and we will not reverse "unless an abuse of discretion affirmatively appears." *State v. Schrock*, 149 Ariz. 433, 441 (1986). An abuse of discretion occurs if the court "makes an error of law or fails to adequately investigate the facts necessary to support its decision." *State v. Pandeli*, 242 Ariz. 175, 180, ¶ 4 (2017). When the PCR court conducts an evidentiary hearing, we defer to that court's factual findings unless they are clearly erroneous. *State v. Sasak*, 178 Ariz. 182, 186 (App. 1993). It is not our role to resolve conflicts in the evidence or to judge the credibility of the experts or other witnesses; that role is left to the trial court. *Id.*; *State v. Fritz*, 157 Ariz. 139, 141 (App. 1988) ("The trial court is the sole arbitrator of the credibility of witnesses.").

¶75 These standards are critical, and from my perspective, the outcome of this case should depend only on a reasoned interpretation and application of Rule 32.1(e), as well as adherence to the abuse of discretion standard of review.

¶76 Rule 32.1(e) states as follows:

Newly discovered material facts exist if:

(1) the facts were discovered after trial or sentencing;

(2) the defendant exercised due diligence in discovering these facts; and

(3) the newly discovered facts are material and not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony that was of such critical significance that the impeachment evidence probably would have changed the judgment or sentence.

If granted an evidentiary hearing, "[t]he defendant has the burden of proving factual allegations by a preponderance of the evidence." Rule 32.13(c).[13]

### A. *Amaral/Bilke*

¶77 The PCR court's ruling turned on its finding that, although postpartum psychosis was a known condition at the time of King's trial, given the general state of practitioners' knowledge at the time, her symptoms would not have triggered that diagnosis, even with the exercise of reasonable diligence. As the court put it, "in [2010] King discovered that back in 2001 that she suffered from [a] constellation of symptoms that resulted in postpartum psychotic episodes" and "this evidence was not reasonably available in 2001 notwithstanding her lawyer's diligent efforts to discover mental-health issues." The court based these findings on numerous pieces of evidence, explaining in part as follows:

> [T]he Court acknowledges that all 3 experts testified that it was possible to have diagnosed King properly in the 2001 time frame. Their differences on just how reasonable it would have been to have made that diagnosis under the 2001 state-of-the-art diagnostic understanding is where rubber meets the road.
>
> While the State argued otherwise, Bruce Peterson's consideration and investigation actually supports this conclusion. He consulted others in order to determine whether he could raise the insanity defense because of postpartum psychosis. As noted *supra*, he found an insufficient basis to do so. . . . [H]is investigation and consultation with experts reveals the 2002 misunderstanding

---

[13] Despite how the majority may characterize these requirements under Rule 32.1(e), *supra* ¶ 24, the first prong (i.e., when the facts were discovered) is not a threshold question, but rather, must be considered concurrently with the rest of the elements. That is particularly so when, as here, the question about when the facts were discovered (first prong) hinges in large part on whether the defendant acted diligently in discovering the diagnosis before trial. The majority cites no authority to support prioritizing the first prong as a stand-alone question, and framing the question as "first" simply because the rule lists it first does not require treating it as a threshold question. *See State v. Bilke*, 162 Ariz. 51, 53 (1989).

of the nature of King's condition and how that condition impacted her ability to discern right from wrong.

The evidence presented fully supports Barnes' opinion and this Court's finding that it was unreasonable to expect that diagnosis in 2001.

The bottom line is that Dr. Barnes' testimony and Dr. Hibbert's testimony on the operative factual points carry the day. The lack of understanding of critical matters such as trauma on the brain, PTSD and postpartum psychosis so totally obscured the diagnosis to the point where a well-trained professional like Dr. Rosengard failed [to] raise the issue in any meaningful way.

**¶78** Significantly, the State does not argue that any of the PCR court's factual findings were clearly erroneous. And contrary to the majority's implicit conclusion that the court "failed to "adequately investigate the facts," the State did not make that argument in its petition. Our rules require an appellant's brief to specify its "contentions with supporting reasons" and legal authorities. *See* Rule 31.10(a)(7). The corollary to that rule is that we generally do not address arguments the parties do not raise. Moreover, the PCR court was in the best position to—and did—consider the credibility of the conflicting expert testimony.

**¶79** That being the case, I turn to the only substantive argument the State raises, which is that the PCR court erred by failing to apply the correct legal standard in deciding that King's postpartum psychosis diagnosis constituted newly discovered evidence. The State contends that as a matter of law, under *Amaral*, King's postpartum psychosis cannot be newly discovered evidence because postpartum psychosis was known, recognized, understood, and diagnosable at the time of her trial.

**¶80** In *Amaral*, a 17-year-old defendant was sentenced to life imprisonment with the possibility of parole after serving a minimum of 57.5 years. 239 Ariz. at 218, ¶¶ 1-2. More than 20 years later, Amaral filed a PCR petition, alleging that "recent scientific findings concerning juvenile psychology and neurology . . . were newly discovered material facts that warranted post-conviction relief." *Id.* at 219, ¶ 6. The PCR court dismissed the petition, which this court affirmed. *Id.* at ¶¶ 6–7. On review, our supreme court considered "whether these advances in juvenile psychology and neurology constitute newly discovered evidence that, if known . . . probably would have changed his sentence." *Id.* at ¶ 8.

¶81          Affirming the petition's dismissal, the supreme court focused on the facts of the case, explaining that

> [t]he advances in juvenile psychology and neurology offered by Amaral *merely supplement then-existing knowledge of juvenile behavior* that was considered at the time of sentencing.  As noted by the United States Supreme Court in *Roper*, [such] scientific and sociological studies *simply confirmed what was already known.*  Although the research itself was conducted after . . . sentencing, the results of the research cannot constitute newly discovered material facts because juvenile behavioral tendencies and characteristics were generally known in 1993, and the trial judge contemplated Amaral's youth and attendant characteristics . . . at the sentencing hearing.

*Id.* at 221, ¶ 17 (citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005)) (emphasis added).

¶82          The supreme court then distinguished Amaral's case from *Bilke*, where the court ordered a new trial in the case of a defendant who had successfully advanced a PCR claim by presenting newly discovered evidence that he had been diagnosed with PTSD and "he had suffered from the disorder when he committed [his] crimes." *Amaral*, 239 Ariz. at 220–21, ¶ 14 (citing *Bilke*, 162 Ariz. at 51–52).  The distinctions between the newly discovered evidence claimed in *Amaral* and the evidence in *Bilke* were readily apparent.  In *Amaral*, the defendant cited developments in juvenile psychology that merely reinforced what was known at the time of trial about the psychology and neurology of underage perpetrators. By contrast, the defendant in *Bilke* pointed to a mental-health diagnosis that was not made until years after trial.  In ticking off those distinctions, the supreme court noted that the defendant in *Bilke* had a condition (PTSD) (1) "that existed at the time of the trial" but (2) "was not yet recognized by mental health professionals" and thus (3) "could not have been diagnosed" until later. *Id.* at 221, ¶ 18.

¶83          The State argues that when the *Amaral* court listed these factors that distinguished that case from *Bilke*, it was setting out the elements required of any PCR claim based on newly discovered medical evidence.  But I do not read *Amaral* as setting down requirements for any comparable PCR petition.  Nothing in *Amaral* specifies that these are conditions that must be met—in the passage on which the State relies, the court was not fundamentally changing the law, but was simply explaining

how the facts in *Bilke* were different from those in *Amaral*. And just because the *Amaral* court distinguished *Bilke* in this manner does not mean our supreme court held that a defendant's diagnosis cannot be newly discovered evidence if, as here, the finder of fact concluded the defendant could not have been reasonably diagnosed with that condition before trial.

**¶84**        To the extent the State argues the PCR court erred because King's diagnosis is more analogous to that of the defendant in *Amaral* rather than *Bilke*, I disagree. Adopting the State's position would also conflict with the supreme court's analysis in *Bilke*. *See* 162 Ariz. at 53. The supreme court in *Bilke* concluded the defendant "easily meets the first requirement that the evidence be newly-discovered; his PTSD was not diagnosed until well after his trial and was not a recognized mental condition at the time . . . . [W]hile defendant may have been aware that his mental condition was not stable, he was not aware that he suffered from PTSD." *Id.* Although the first sentence in this passage could be construed to require that the mental condition may not have been "recognized" at the time, the second sentence makes plain that the point is whether the defendant *knew or should have known he suffered from the condition*—i.e., whether the condition was reasonably diagnosable at the time of trial.[14] It is also consistent with this court's analysis in *King III*, 2 CA-CR 2015-0140-PR, at *2, ¶ 9, where we rejected the State's argument that "the condition must be unknown to the scientific community at the time of trial to be considered newly discovered."

**¶85**        In emphasizing this point, *Bilke* cited *Henry*, in which the supreme court held that a plaintiff had timely filed a claim for workers' compensation based on PTSD more than 20 years after its onset. *Henry v. Indus. Comm'n of Ariz.*, 157 Ariz. 67, 69–70 (1988). The basis for the supreme court's decision was that the claimant's PTSD was not diagnosable at the

---

[14]        In analyzing the applicability of *Amaral*, the PCR court explained that the supreme court denied relief after it "applied well-settled principles regarding newly discovered evidence and found that the trial court already considered these facts." I agree. Thus, although the PCR court's conclusion that the existence of newly discovered evidence requires a "flexible" and "particularized analysis . . . that considers the facts and circumstances of each particular case" may have been inartful, read in context, it hardly misstated the law. I view the court's labeling as a recognition that evaluating a colorable claim, including a diagnosis of a mental illness, requires careful consideration of the elements set forth in Rule 32.1(e), and nothing in *Amaral* changes that requirement.

time of the injury: "We refuse to hold a claimant to the knowledge that his job had caused a serious medical condition based on post-traumatic stress syndrome when the condition was not diagnosable at the time he first sought treatment." *Id.* at 70. As applied here, *Henry* teaches that the point is not whether medical experts had long recognized postpartum psychosis and diagnosed it in some women, but rather, as the PCR court found, it was not until after King's trial that her particularized symptoms came to be generally recognized as symptoms of postpartum psychosis.

¶86 The State points to no authority supporting the position that just because the relevant medical field put a name to a condition long ago, a defendant who could not reasonably have been diagnosed with that condition at the time of trial cannot prevail in a PCR proceeding when she later proves that newly discovered evidence (the diagnosis) shows she had the condition. Yet under the majority's analysis, a court must, as a matter of law, reject any claim of newly discovered evidence if the condition was known at the time of trial.

¶87 The State's position, like the majority, overlooks the established principles governing the second prong of Rule 32.1(e), which requires consideration of whether "the defendant exercised due diligence in discovering" the material facts. *See* Rule 32.1(e)(2). This element requires a defendant to demonstrate he or she (1) could not discover the newly discovered facts *before* trial through reasonable diligence, and (2) diligently pursued a remedy under Rule 32 *after* trial. *State v. Hess*, 231 Ariz. 80, 82, ¶¶ 6–7 (App. 2012) (citing Rule 32.1(e); *Bilke*, 162 Ariz. at 53; *Saenz*, 197 Ariz. at 489, ¶ 7). The majority's decision to disregard the PCR court's finding and hold that King did not exercise due diligence because the experts opined she "could have" been properly diagnosed before trial effectively adds a requirement to Rule 32.1(e): "If any possibility exists a defendant could have, but did not, discover the evidence before trial, then the claim is barred as a matter of law." Making that addition is not our role.

¶88 It is therefore significant the State does not challenge on appeal the PCR court's finding that, given the limitations of medical experts' understanding of postpartum psychosis at the time, King reasonably could not have been diagnosed with that condition before trial. When a defendant claims newly discovered evidence based on a new medical diagnosis, the question of whether the diagnosis could have been discovered in the exercise of reasonable diligence must be answered before the defendant can obtain relief. To say this is not to add a requirement to Rule 32.1(e), nor to say that it is the only factor—it is a confirmation of what is required by the second prong of the Rule. Amaral's condition was not

newly discovered because his condition (his tender age) and that condition's behavioral implications were known and considered at sentencing, but Bilke's condition and the accompanying behavioral implications could not have been known and considered at sentencing because the condition was undiagnosable at the time of sentencing. *See Amaral*, 239 Ariz. at 221, ¶ 18.

**¶89** The State contends *Amaral* made clear that advancements or changes in the understanding of a previously known condition do not constitute newly discovered evidence, citing the supreme court's statement that "it is the condition, not the scientific understanding of the condition, that needs to exist at the time of [trial or] sentencing."[15] Of course, advancements or changes in understanding of a condition, by themselves, cannot constitute newly discovered evidence; instead, significant advances may allow the condition to be diagnosed for a defendant who could not have been diagnosed before trial, subject to whether the diagnosis meets the requirements of Rule 32.1(e), including proof that the defendant acted with due diligence in attempting to discover the diagnosis. In this case, the PCR court weighed the evidence presented and found that trial counsel exercised such diligence.

**¶90** Although the majority discusses *Amaral* and *Bilke*, it does not expressly respond to or resolve the State's contention that a defendant may *never* prevail on a newly discovered evidence claim based on a condition that was recognized and diagnosable at the time of trial. But the majority seems to take the position that because the medical field named postpartum psychosis and identified some of its symptoms long ago, under no circumstances can a defendant claim a post-trial diagnosis of postpartum psychosis as newly discovered evidence, even if there have been significant advances in what the condition entails and how its complex symptoms may be diagnosed. If this is in fact the majority's view of the matter, it is unclear why the majority believes it is necessary to question the PCR court's decision based on theories that are not raised by the State. For, example, the majority sua sponte declares (1) that King cannot manufacture newly

---

[15] The supreme court made this statement in refuting this court's focus on the fact that scientific advances in psychology and neurology "did not exist at the time of Amaral's sentencing." *See Amaral*, 239 Ariz. at 222, ¶ 19. The supreme court explained that although it was true the scientific advancements had not yet been discovered, the proper inquiry was whether the "condition" existed at the time of sentencing, just as with *Bilke*, whose PTSD condition existed at the time of trial, but had not been discovered because it was previously unrecognized. *Id.*

discovered evidence by sharing different information with mental health experts who examined her before and after trial, and (2) she prevented Dr. Rosengard from discovering her post-partum psychosis. *Supra* ¶ 44. The majority would have no need to raise such matters if it agrees with the State that, under *Amaral*, a defendant cannot as a matter of law bring a newly discovered evidence claim based on a condition that was known at the time of trial.

¶91 Similar to the majority's view, the State's argument ignores the plain language of Rule 32.1(e), and seeks to add the additional requirement that if the condition existed at the time of trial and could have been discovered, a claim of newly discovered evidence fails as a matter of law. In doing so, the State attempts to distance itself from the pretrial due diligence requirement because, given our standard of review, it presumably recognizes it cannot present a compelling challenge to the PCR court's finding that the post-partum diagnosis could not have been discovered by King or her counsel in the exercise of due diligence. It therefore makes sense that the State repeatedly asks us to focus only on whether post-partum psychosis was a recognized and diagnosable condition, and avoids the companion issue of whether the diagnosis could have been discovered with the exercise of reasonable diligence. The State, however, does include one sentence on the topic, asserting the PCR court "abused its discretion in finding that King could not have discovered the diagnoses at the time of her trial through the exercise of reasonable diligence."

¶92 The State's petition makes it clear that only three specific issues were presented for our review. *Supra* ¶ 72. And even though the issue of pretrial due diligence was contested before the PCR court, the State did not include it as one of those three issues.[16] The issue has therefore been waived. *See* Rule 32.16(c)(4) ("A party's failure to raise any issue that could be raised in the petition for review or cross-petition for review constitutes a waiver of appellate review of that issue."). Even assuming the State properly challenged the PCR court's pretrial due diligence finding, the record supports that finding.

¶93 The proper focus of the due diligence inquiry is whether the evidence demonstrates that King and her counsel made reasonable efforts before trial to discover the newly discovered evidence, i.e., her diagnosis of postpartum psychosis. *See State v. Turner*, 92 Ariz. 214, 221 (1962) (stating

---

[16] The State's second issue is whether King "acted diligently" in filing her newly discovered evidence claim, not whether she acted with due diligence in pursuing a diagnosis.

that the evidence must show "due diligence was used to ascertain and produce the evidence in time for use at his [or her] trial," and that an account must be made of the "failure to produce the evidence by stating explicitly the details of his [or her] efforts to ascertain and procure it"). The majority relies on the PCR court's finding that "all three experts testified it was possible to have diagnosed King properly in the 2001 time frame," but it does not necessarily follow that King or her counsel failed to take reasonable steps to discover her mental health condition at the time of trial. *See Saenz*, 197 Ariz. at 489, ¶ 7 ("[U]nder Rule 32.1(e), a defendant must establish that the evidence . . . could not have been discovered and produced at trial *through reasonable diligence . . . .*") (emphasis added). Instead, whether their efforts were reasonable necessarily required a factual determination, which is precisely what occurred here.

¶94　　　　When we remanded for a hearing on King's PCR petition, we specifically directed the PCR court and the parties to address whether King or her counsel could have discovered her mental health condition before trial with reasonable diligence. *See King III*, 2 CA-CR 2015-0140-PR, at *5, ¶ 17 (remanding for evidentiary hearing)*; see also State v. Dogan*, 150 Ariz. 595, 600 (App. 1986) (using the phrase "reasonable diligence" in articulating Rule 32.1(e)'s requirements); *State v. Mann*, 117 Ariz. 517, 520 (App. 1977) ("The court must also consider whether the defendant was diligent in attempting to develop the new evidence prior to trial."); *Skakel v. State*, 991 A.2d 414, 449 (Conn. 2010) ("Due diligence means doing everything reasonable, not everything possible. . . . The question which must be answered is not what evidence might have been discovered, but rather what evidence would have been discovered by a reasonable plaintiff by persevering application, [and] untiring efforts in good earnest.") (citation omitted). To say a defendant must establish that a mental health condition was unknown, unrecognized, and not capable of diagnosis by *any* mental health practitioner at the time of trial or sentencing as a prerequisite of proving a subsequent *diagnosis* of the condition plainly disregards this court's prior ruling, which properly applied the due diligence prong of Rule 32.1(e).

¶95　　　　Peterson testified that he believed King likely suffered from mental health issues and he retained an expert psychologist to determine whether an insanity defense could be raised. When this first evaluation recommended additional testing, Peterson retained a psychiatrist to specifically address "postpartum issues." Notwithstanding these efforts, neither expert at the time diagnosed King with postpartum psychosis, or otherwise provided a non-frivolous ground for an affirmative defense based on King's symptomology. Thus, although the record establishes that,

similar to the situation in *Bilke*, King and Peterson knew she was mentally unstable at the time of her trial, there is no evidence that either of them knew King suffered from postpartum psychosis at the time of trial. *Cf. Saenz*, 197 Ariz. at 490–91, ¶ 13 (explaining that knowledge of evidence precluded due diligence); *State v. Jeffers*, 135 Ariz. 404, 427 ("[W]here a defendant knows of the existence and identity of a witness before trial and makes no effort to obtain the witness' testimony, such testimony will not ordinarily justify a new trial."). The State does not point to any conflicting evidence; nor does it suggest that Peterson retained an unqualified expert to determine whether King had a postpartum mood disorder, or that it was unreasonable for him to rely on the information he received.

¶96 The State's assertion that the PCR court abused its discretion by finding that King exercised due diligence before trial fails to properly account for the court's uncategorical rejection of Dr. Pitt's testimony on the issue of whether King's condition was readily diagnosable at the time of her trial. For example, the PCR court was not persuaded by Dr. Pitt's testimony "that the differences between DSM-IV and DSM V (and the understanding of postpartum psychosis) were mere repackaging and were not substantive." The court went on to say that Dr. Pitt "also unconvincingly testified that a reasonable health-care provider would have considered a constellation of symptoms that would have included something 'along the lines of postpartum psychosis,'" and observed that "Dr. Pitt did not adequately explain just how he reached that conclusion other than to suggest that the puzzle pieces were there because the lexicon existed." The court also explained that Dr. Pitt was "far too strident and too vested in the State's position," noting that he "openly ridiculed Doctors Barnes and Hibbert's belief that postpartum issues required any specialized knowledge at all."

¶97 Measuring the mental health professionals' lack of understanding of King's condition at the time of the trial against Peterson's efforts, the PCR court did not abuse its discretion by concluding that "[i]f the medical community did not understand the complex nature of post-partum psychotic episodes brought on by a combination of disorders, surely her counsel could not have been expected to do so." *See Orndorff v. Virginia*, 628 S.E.2d 344, 353–54 (Va. 2006) (holding that the defendant exercised due diligence in discovering her mental health condition, which was discovered after trial, because when "presented with [two expert's opinions] that [defendant] did not have a mental disorder that might support an insanity defense, [defendant's] counsel reasonably relied on those opinions and w[as] not required to seek the opinions of other experts"). These findings, which the court made based on its careful review

of the evidence, provided more than ample support for its finding that King and her counsel exercised due diligence before trial in investigating a defense based on her mental condition.

## B.     Post-Trial Diligence in Discovering Material Facts

¶98     The State argues the PCR court abused its discretion because it failed to consider whether King was diligent in pursuing her claim, as required under Rule 32.1(e).  The State contends that King "never attempted to explain" her delay in retaining Dr. Hibbert, and then Dr. Barnes, and therefore she "failed to allege, let alone prove, that she diligently pursued her claim."  *See* Rule 32.1(e)(2); *Hess*, 231 Ariz. at 82, ¶ 7 (explaining that the defendant must show it diligently pursued a remedy under Rule 32).  But because the State failed to raise this argument in the PCR court, it has been waived.  *See State v. Vera*, 235 Ariz. 571, 573–74, ¶ 8 (App. 2014) ("[W]e ordinarily do not consider issues on review that have not been considered and decided by the trial court; this is particularly true when we are reviewing a court's decision to grant or deny post-conviction relief under Rule 32.").

## C.     Sufficiency of Findings

¶99     Finally, the State argues the PCR court "abused its discretion by failing to make sufficient factual findings when it concluded that evidence of King's recent diagnoses probably would have resulted in a [GEI] verdict."  *See* Rule 32.13(d)(1) ("The court must make specific findings of fact and expressly state its conclusions of law relating to each issue presented.")  The State contends the court improperly focused only on determining witness credibility in accepting Dr. Barnes' opinion that due to her condition, King could not have appreciated the wrongfulness of her conduct.  *See Pandeli*, 242 Ariz. at 180, ¶ 3 (explaining that deference to the court's factual findings was not required where the court "made few specific findings and failed to connect them to its conclusions").  This argument fails to acknowledge the court's analysis of expert testimony offered on the issue of whether King's diagnosis of postpartum psychosis probably would have resulted in a GEI verdict.

¶100     As an initial matter, the court's findings on whether the outcome would probably have been different must be read in context with the rest of the court's ruling.  For example, earlier in the ruling, the court explained in part as follows:

> Dr. Barnes concluded that King's diagnosis, under the DSM-
> V[], is that in 2001, she suffered bipolar disorder of a

dissociative type with psychotic episodes. She also met the diagnostic criteria for PTSD. . . . She further opined that:

- The symptoms included mania, confusion, cognitive clouding, hallucinations and/or delusions, depersonalization, dissociation, thought disorder, memory loss and insomnia. . . .

- King suffered from postpartum psychosis in 2001 when she seriously harmed her daughter, incidents for which she was convicted.

. . . .

Dr. Barnes carefully documented her findings in her report and supported those findings based on the various clinical evaluations of King and Dr. Pitt's forensic evaluation. The support for her diagnosis included her review of King's childhood history of trauma, drug abuse, family drug abuse, sexual abuse, her mother's mental illness, physical abuse and abandonment.

She noted that King's history included memory loss now known to be a symptom of psychotic episodes and there was evidence that King endured dissociative states that included both depersonalization and derealization.

¶101    At the outset of the section of the ruling addressing the likelihood of a different outcome, the PCR court stated that it agreed with King's argument "that had the postpartum evidence been presented at trial, the result probably would have been different."  After outlining the legal principles governing a GEI defense under A.R.S. § 13-502(A),(C), including the defendant's burden, the court explained in part the significance of witness credibility in deciding this issue:

At the outset of the Court's evaluation of the likely impact of this newly discovered evidence, the Court wants to be clear about it how it views Dr. Pitt's overall testimony and evaluation because it is here where he decidedly differs with Doctors Barnes and Hibbert.[]  Indeed, Dr. Pitt was unequivocal and unwavering in his position that King knew right from wrong.

First, the Court notes that Dr. Pitt's forensic evaluation was exhaustive. He too had access to the same information and reviewed all of it. Moreover, like Barnes, Dr. Pitt's credentials were impressive.

Nonetheless, the Court finds that clinical experience is vital to a proper evaluation of postpartum psychosis. Stated another way, the value arising from real-life clinical experience in assessing and treating women with postpartum issues cannot be understated. . . . Such hands-on experience placed Dr. Barnes in a commanding position to offer more sound opinions in this case. In sharp contrast, Dr. Pitt had no recent clinical experience and, in any event, had very little clinical experience with perinatal and mood disorders.

. . . .

The Court finds that Dr. Pitt's findings were predetermined and aimed at undermining a finding that [King] did not know right from wrong. Strangely, he recognized possible psychotic features of King's condition as part of the diagnosis but still categorically rejected any suggestion that King endured a dissociative state at the time the offenses took place. He did so, in part, because he did not believe that the psychosis could come and go. . . . Not surprisingly, he disagreed with Dr. Barnes' diagnosis of PTSD (which strongly supports a finding that psychosis waxed and waned) and in so doing Dr. Pitt overlooked the impact of King's long history of childhood abuse as a high risk factor.

Forensically, Dr. Pitt purportedly attached his opinions to behaviors that were documented from collateral sources and repeatedly drew inferences that the behaviors demonstrated that King knew right from wrong. He came to this conclusion because: (i) the very serious injuries occurred over a fairly significant period of time; (ii) King stopped taking her daughter to the pediatrician which he viewed as concealment; (iii) King "deceived" her fiancé[] by calling 9-1-1 and feigned ignorance of why her daughter was listless; (iv) King made false statements to medical personnel and detectives (*e.g.*, King stating "all I wanted to know what is wrong with my baby").

The problem with Dr. Pitt's analysis is that he viewed these collateral sources through a lens that presumes guilt, offered a glowing review of the prosecution's effort in the case and did not meaningfully weigh the impact of the postpartum evidence with respect to whether it could prove her affirmative insanity defense.

. . . .

Excluding the possibility of the waxing-and-waning nature of the psychotic episodes, Dr. Pitt opined that if that were the case, she would have reached out for help during the waning periods. Oddly, he acknowledged that she did reach out but without success—Dr. Pitt then slighted her revelation of that effort as somehow engaging in a blame game.

Ultimately, Dr. Barnes and Dr. Hibbert's explanations of how the psychosis presented itself fit hand [in] glove with the clinically documented presentation of King's actions. The evidence paints a clear picture that proves to this Court that King suffered from a mental health disease or defect that rendered her unable to discern right from wrong. The weight of this evidence is clear and convincing.

Accordingly, the Court concludes that a jury probably would have found King guilty except insane. The same testimony and evidence presented to this Court would clearly and convincingly have demonstrated to a jury that King suffered from a mental disease or defect that rendered her unable to tell right from wrong.

The court then concluded that a jury probably would have found King GEI because "[t]he same testimony and evidence presented to this Court" would have demonstrated to a jury that King "suffered from a mental disease or defect that rendered her unable to tell right from wrong." Unlike the cryptic findings described in *Pandeli*, the PCR court here properly made specific findings and connected them to its conclusions. *See Pandeli*, 242 Ariz. at 180, ¶ 3.

¶102    The State's argument also fails to account for the PCR court's discretion in this type of proceeding. In an evidentiary hearing to determine whether newly discovered evidence would probably result in a different verdict, *Hess*, 231 Ariz. at 83, ¶ 11, a court must "receive evidence, make factual determinations, and resolve material issues of fact." *State v.*

*Gutierrez*, 229 Ariz. 573, 579, ¶ 31 (2012).  And when the new evidence relies on expert witnesses willing to testify at a new trial, "those witnesses must appear worthy of belief *to the trial judge* hearing the motion."  *State v. Serna*, 167 Ariz. 373, 374 (1991).  Thus, the PCR court "was in a much better position than we are to determine the weight to be given the [testimony] and whether or not the testimony set forth . . . would probably change the result in case of a new trial."  *Id.* at 375 (citing *Turner*, 104 Ariz. at 471–72).

**¶103**		In sum, the PCR court properly exercised its discretion in weighing the testimony and ensuring sufficient facts supported its evidentiary findings; the court did not abuse that discretion in not addressing King's claim with greater specificity, as its order contains sufficient findings to facilitate our review.  *See State v. Tankersley*, 211 Ariz. 323, 325 (2005) ("An important purpose of Rule 32.[13] is to facilitate appellate review of superior court determinations regarding post-conviction relief.").

### D.	Conclusion

**¶104**		As I have discussed at length above, and contrary to the State's contention, *Amaral* and *Bilke* do not foreclose relief in this case.  And I further disagree with the majority's decision to overturn the PCR court's findings based on its implicit belief that King should have been diagnosed before trial.  Our role is not to reweigh evidence.  *Sasak*, 178 Ariz. at 186.

**¶105**		While purporting to analyze the evidence presented to the PCR court, the majority focuses only on facts favorable to the State in reaching different conclusions than the trial judge about the weight, credibility, and reliability of nearly all the testimony that court heard.  For example, the State's briefing does not anywhere address the actions Peterson took or failed to take to discover King's condition.  Nor does the State's briefing reference Dr. Rosengard, and it mentions Dr. Hibbert only in the context of procedural history; yet the majority presses points related to these experts that the State never even mentions.

**¶106**		This is, of course, a difficult case, and our decision must reflect a commitment to the sound application of unbiased review and detached application of the rule of law.  If I were the judge hearing this matter in the PCR court, I might have come to a different conclusion.  But I was not there to hear the witnesses testify; thus, what I might have done has no bearing on the outcome.  When a case involves factual determinations, the question has never been what I, or any other appellate judge, would do if we had

presided at the evidentiary hearing.  Instead, we defer to the PCR court's resolution of the factual conflicts.

¶107        On the issues raised by the State in its petition for review, the State has not shown the PCR court abused its discretion in finding King successfully established that her diagnosis of postpartum psychosis was newly discovered evidence that probably would have changed her verdict. Thus, I respectfully dissent, and I would accept review, but deny relief.

